**Virgil MATHEWS et al., Petitioners,**

**v.**

**SUN OIL COMPANY et al., Respondents.**

No. B–145.

Supreme Court of Texas.

Feb. 21, 1968.

Rehearing Denied March 27, 1968.

Sanders, Scott, Saunders, Brian & Humphrey, C. J. Humphrey, Amarillo, for petitioners.

Lynn Adams, Oklahoma City, Okl., C. F. Heidrick, E. M. Cage, J. C. Peurifoy, Jackson, Walker, Winstead, Cantwell & Miller, and A. W. Walker, Jr., Dallas, Underwood, Wilson, Sutton, Heare & Berry, H. A. Berry, Amarillo, for respondents.

NORVELL, Justice.

Petitioners, Virgil Mathews[1] and wife, Elsie May Mathews, J. W. Sanders, E. T. Scott Trust[2] and the Willie Belle Sanders Trust[3], brought suit against Sun Oil Company and Kerr-McGee Oil Industries, Inc., seeking a decree that an oil, gas and mineral lease dated March 8, 1957, executed by Virgil Mathews and wife to Kerr-McGee had terminated and was no longer effective insofar as Section 4, Block M–22, Texas Central Railway Company Survey, Hutchinson County, Texas, was concerned. The trial court rendered summary judgment for respondents. Rule 166–A, Texas Rules of Civil Procedure. The Court of Civil Appeals affirmed. 411 S.W.2d 561. We affirm the judgments of the courts below.

The lease of March 8, 1957[4] was for a primary term of five years and covered both Section 4, above described, and a contiguous tract, namely, Section 13, C. L. & C. Co. Survey, Hutchinson County, Texas. At the time of trial, the lease which had been obtained by Sun under a farmout from Kerr-McGee was in its secondary term and being held by production from Section 13. Immediately after the execution of the lease, the title to the royalty interests in Section 4 were held as follows:

$\frac{1}{16}$—by Virgil and Elsie May Mathews

$\frac{7}{256}$—by J. W. Sanders

$\frac{7}{256}$—by Sanders Trust

$\frac{1}{128}$—by Scott Trust

The interests of J. W. Sanders, the Sanders Trust and the Scott Trust were non-participating royalty interests. The leasing powers or the executive rights were vested in Mathews.

Mathews also held the executive rights to Section 13 and a $\frac{1}{16}$ royalty interest therein. The remaining $\frac{1}{16}$ royalty interest was non-participating and was held by the successors in interest to R. Niles Graham and Margaret Graham Crusemann. Such successors are not parties to this suit.

The controlling question relates to the legal effect of Mathews' action in combining two tracts in one lease when the holders of non-participating royalty interests in such tracts were not identical.

Petitioners contend that both courts below erred in holding as a matter of law from the uncontroverted facts that the oil and gas lease of March 8, 1957 was valid and subsisting as to their respective interests in Section 4 as the primary term of such lease had expired and there was an absence of drilling upon or production from said section. The validity of this contention is the sole issue in the case. The petitioners' arguments are presented primarily from the position of the holders of the non-participating royalty interests. Their situation is different from that of Mathews as above indicated, and if they cannot recover, it seems clear that Mathews cannot recover. We shall, therefore, discuss the case from the standpoint of the non-participating royalty owners, namely, J. W. Sanders, the Sanders Trust and the Scott Trust.

Petitioners rely heavily upon Brown v. Smith, 141 Tex. 425, 174 S.W.2d 43 (1943), wherein it was said that in a situation bearing some similarity to the one now before us that:

"In many respects the burdens and obligations of petitioners under the lease tendered by respondents would be the

1. Virgil Mathews died during the pendency of this suit and Elsie May Mathews, Stephen Mathews and Freeman Barkley, independent executrix and independent executors of the estate of Virgil Mathews, were substituted as parties plaintiff.

2. The trustees of the Scott Trust are Zula Scott, E. T. Scott, Jr. and John William Scott.

3. The trustee of the Sanders Trust is Howard F. Sanders.

4. This was a top lease. Kerr-McGee had secured a prior lease from Mathews dated November 9, 1949 for a primary term of eight years.

same as they would be under two separate leases, one affecting the 20-acre tract and the other affecting the 42.75-acre tract."

The suit was one for specific performance brought by the sellers of an oil and gas lease against the purchasers thereof for specific performance. The purchasers' defense was that sellers did not tender the title that purchasers had contracted to buy. The sellers were Ector Smith and Floyd Smith and their respective wives. The lease which they tendered to the purchasers contained the following clause:

" 'Of the acreage above described, the said Floyd Smith and wife, Bertha Smith, own twenty (20) acres and the said Ector Smith and wife, Ada Smith, own 42.75 acres, and it is understood and agreed as between Lessors, that the rents and royalties hereinafter stipulated to be paid on said 62.75 acre tract are to be pooled and shared by said Lessors in proportion to acreage owned.' "

However, it appeared that Floyd Smith deraigned title to the 20-acre tract from Mrs. C. B. Lee who retained a ⅟₃₂ royalty interest, but no leasing rights to the tract. Mrs. Lee did not join in the lease. This Court held that Brown had no power or authority to pool Mrs. Lee's royalty interest with those of other persons holding royalty interests in the 20-acre and 42.75-acre tracts involved because:

"The language used, by which Mrs. Lee reserved to herself the one-thirty-second royalty interest in all of the 20 acres conveyed, with provision that the royalty be delivered to her as is usual where oil, gas or other minerals are produced and saved, negatives the existence of an intention to confer upon her grantee the power or authority to convey or in any way dispose of any part of the royalty interest which she reserved."

In Minchen v. Fields, 162 Tex. 73, 345 S.W.2d 282 (1961), this Court reiterated the rule stated in the Brown case. It was said:

"We agree with the Court of Civil Appeals that the act of Fields (the holder of the leasing power) in executing one lease covering the 802.6 acres did not unitize or pool all the mineral interests in said land. Brown v. Smith, 1943, 141 Tex. 425, 174 S.W.2d 43; Nugent v. Freeman, Tex.Civ.App.1957, 306 S.W.2d 167, wr. ref. n. r. e."

The Court then quoted with approval the following statement from the opinion of the Court of Civil Appeals (330 S.W.2d 683, 1. c. 687):

"[T]he reason of the rule is that where mere executive rights are conferred or reserved, there is no intention evidenced to vest authority to convey a royalty interest reserved or the royalty interest attributable to the minerals leased and to hold that such holder can unitize or pool the interest would allow him to convey such royalty interest because a unitization of the royalty and minerals under different tracts effects a cross-conveyance to the owners of minerals under the various tracts of royalty or minerals so that they all own undivided interests under the unitized tract in the proportion their contribution bears to the unitized tract. Veal v. Thomason, 138 Tex. 341, 159 S.W.2d 472; Brown v. Smith, supra."

No pooling problem is here involved; nor is it contended that the lease was invalid when executed; nor that such lease should be cancelled in whole or in part because the operator thereof has failed to reasonably develop the mineral potentials of the lands under the lease;[5] e. g. W. T. Waggoner Estate v. Sigler Oil Co., 118 Tex. 509, 19 S.W.2d 27, 1. c. 29 (1929); nor is it

5. An affidavit executed by A. N. Tyler, division development geologist for Sun, states that a well location on Section 4 had been approved but drilling was not

' commenced because of the filing of the present suit in which the plaintiffs asserted the invalidity of the Kerr-McGee lease insofar as Section 4 was concerned.

asserted that Mathews has breached a duty which he as the holder of the executive rights owed to the holders of the non-participating royalty interests; e. g. Schlittler v. Smith, 128 Tex. 628, 101 S.W.2d 543 (1937). It is simply argued that Brown v. Smith by analogy supports the proposition that the lease should be considered as two leases, one covering Section 13 and one covering Section 4, and that no production having been obtained from Section 4, the lease as to that tract has terminated.

■ Because a lease will be considered as two leases for certain purposes, it does not follow that a single lease will be considered as two leases for all purposes whenever two or more tracts of land and diverse royalty interests are involved. It is a rule of general application that in the absence of anything in the lease to indicate a contrary intent, production on one tract will operate to perpetuate the lease as to all tracts described therein and covered thereby. Orive v. Sun Oil Co., 346 S.W.2d 383 (Tex.Civ.App.1961, writ ref'd), and authorities cited therein.

The lease here involved contained the following pertinent clauses:

"1. Lessor, in consideration of Fifteen Thousand Seven Hundred Twenty and no/100 Dollars ($15,720.00) in hand paid, of the royalties herein provided, and of the agreements of Lessee herein contained, hereby grants, leases and lets exclusively unto Lessee * * * the following described land in the County of Hutchinson, State of Texas to wit:

"All of Section 13, D. L. & C. Co. Survey, Hutchinson County, Texas, containing 244 acres, more or less:

"All of Section 4, Block M–22, Texas Central RR Co. Survey, Hutchinson County, Texas, containing 542 acres, more or less.

"For the purpose of calculating the rental payments for which provision hereinafter is made, said land shall be treated as comprising 786 acres, whether it actually comprises more or less.

"2. Subject to the other provisions herein contained, this lease shall be for a term of five years from Nov. 9, 1957 (called 'Primary term') and as long thereafter as oil, gas, or other mineral is produced from the land hereinabove described."

■ The lease expressly provides that it shall remain in force as long as oil, gas or other mineral is being produced from the land (Sections 4 and 13) therein described. In arguing for a contrary construction, petitioners do not rely upon the wording of the lease but upon the title situation relating to the non-participating royalty interests. The holder of the executive rights has the power to lease the premises for the production of oil, gas, or other minerals. Quite obviously, he would not be authorized to make a contract binding upon the non-participating royalty owners which would prevent, hamper or stifle production to the prejudice of such owners, and while he may lease and thus vest title to a working interest under such lease, he may not convey the reserved royalty interest.

■ The distinction between the inclusion of two tracts in one lease by the holder of a leasing power and the pooling of royalty interests is that the execution of a lease is an authorized act, while pooling and the cross-conveying of royalty interests is an unauthorized act. In order to sustain petitioners' position that Section 4 is no longer under the lease, it would be necessary to disregard the plain wording of the habendum clause, and a court would have to do something far more radical than raising or recognizing an implied covenant or something of a similar nature. It would be necessary to rewrite the habendum clause in an authorized lease and transform it into an entirely different contractual obligation. We are constrained to hold that a situation is not here presented which requires that we treat the Kerr-McGee lease as two separate

leases insofar as the habendum clause is concerned.

Petitioners' points are overruled and the judgments of the courts below are affirmed.

GRIFFIN, J., notes his dissent.

Dissenting opinion by SMITH, J.

### DISSENTING OPINION

SMITH, Justice.

I respectfully dissent.

Although this cause went off on summary judgment, the fact remains that the suit was filed by Mathews, the Scott Trust, J. W. Sanders and the Sanders Trust against Sun Oil Company and Kerr-McGee Oil Industries, Inc. seeking a court declaration that the oil and gas lease terminated insofar as Section 4 was concerned at the end of the primary term. Mathews filed a separate motion for summary judgment still seeking a declaration by the court that the lease had terminated. Likewise, the Scott Trust, J. W. Sanders and the Sanders Trust, in addition to their petition for a judgment declaring the lease terminated on November 9, 1962, as to Section 4, moved for summary judgment declaring the lease terminated, "because the pleadings, depositions, and admissions on file together with affidavit attached, show that there is no genuine issue as to any material fact." Kerr-McGee and Sun Oil Company in their motion for summary judgment pray that the oil and gas lease be held to be in full force and effect even though no production was obtained from Section 4. Therefore, I deal with this cause as though it is one seeking a declaratory judgment.

Contrary to what is said in the majority opinion, the record as made in the trial court does not restrict the controlling issue in this case to the legal effect of Mathews' action in combining two tracts in one lease. The petitioners' contention in the court of civil appeals was to the effect that the respondents, Kerr-McGee et al., used the one lease method as a vehicle to effect a pooling or communitization of the royalty ownership of petitioners in Section 4 with the royalty ownership in Section 13, thereby accomplishing what they had failed to accomplish when the non-participating royalty owners in Section 13 rejected a proposal to unitize.

### The Questions To Be Decided

*One of the principal questions* for decision is: Does the owner of the executive rights have the power to execute a lease which would be binding upon the owners of non-participating royalty interests after the expiration of the primary term even though no drilling operations were begun and no production was obtained from the only tract in which they own an interest? *The second question* is: Are those plaintiffs who owned non-participating royalty interests in Section 4, which interests were never conveyed to the owner of the executive rights, estopped to assert their right to have the oil and gas lease terminated merely because of the warranty provision in the lease which was executed by the owner of the executive rights only? In other words: Are such non-participating royalty owners estopped from claiming that paying production from Section 13 does not continue the lease in full force and effect after the expiration of the primary term as to Section 4? *The third question is*: Does the evidence show as a matter of law that the oil and gas lease was executed by Mathews, the holder of executive rights, and accepted by Kerr-McGee, the original lessee, in violation of a fiduciary duty owed to the non-participating royalty owners, and, if so, is Kerr-McGee entitled to the defense of estoppel as against the holder of the executive rights so far as his interest in Section 4 is concerned? In other words: Will the non-participating royalty interest owners be able to obtain full relief if the lease is declared terminated only as to their interest and left in effect as between Mathews and Kerr-McGee? *The fourth question is*: Does the evidence show as a matter of law that Kerr-McGee knowingly participated in

the execution of an oil and gas lease which by its terms violated the duty owed the non-participating royalty owners by the holder of the executive rights to perform his duties and exercise his power and authority as the holder of the executive rights in a manner reflecting the utmost fair dealing?

These are the controlling questions relating to the legal effect of the action of Mathews and Kerr-McGee in executing an oil and gas lease in such a manner as to burden indefinitely the interest of the Scott Trust et al. solely as a result of production secured upon lands in which the Scott Trust et al. had no title, and, therefore, would not be entitled to share in such production. The legal consequences of combining two separate titles in one lease is not to be determined by *Mathews' actions alone*, but by the *actions of both Mathews, the holder of the executive rights, and Kerr-McGee, the original lessee*.

It is my position that this record shows as a matter of law that Mathews has violated the duty owed the Scott Trust et al. to use utmost fair dealing in the exercise of the executive power with which he has been invested, and that Kerr-McGee *knowingly participated* in such violation of duty. Kerr-McGee was just as much a party to the breach of the duty of utmost fair dealing as was Mathews. As I will point out later, the oil and gas lease so far as Section 4 is concerned contains provisions which support an action for termination of the lease, whether the action is brought before or after the expiration of the primary term. It has been said that the law on the subject of executive rights in connection with non-executive interests is still in the formative stage and that it will be some time before it is fully developed. See Jones, 15th Oil & Gas Inst. 35 (Sw. Legal Fdn. 1964). This Court, in my opinion, has an opportunity to declare the law which shall govern the disposition to be made of the controlling issues presented in this case.

## The Scott Trust

In disposing of the issues involved, this dissent will deal specifically with the title held by the Scott Trust in Section 4. The views herein expressed as to the Scott Trust interest apply with equal force to the interests owned by J. W. Sanders and the Sanders Trust. A special warranty deed, dated March 10, 1949, recites that J. W. Sanders et ux. conveyed to the Scott Trust a "$\frac{1}{128}$th non-participating oil, gas and other mineral royalty interest *in and to* * * * surveys * * * four (4) in Block M–22, TC Ry. Co., Hutchinson County, Texas." This is the same tract sometimes referred to in the record and briefs as Section 4. It should be noted here that the oil and gas lease contract between Mathews and Kerr-McGee was not executed until March 8, 1957. The lease was for a primary term of 5 years. The record is undisputed that the Scott Trust owned no interest in Section 13, the other tract described in the Mathews-Kerr-McGee Lease. Also, the non-participating royalty owners in Section 13 owned no interest in Section 4. The oil and gas lease involved was *prepared* by Kerr-McGee. The lease contained several clauses which afford a basis for the conclusion herein expressed that Kerr-McGee knowingly participated in violating the duty owed by Mathews to the non-participating royalty owners to use utmost fair dealing in exercising the executive powers vested in him. Some of the clauses were these: First. The lease describes two separate and distinct chains of title. On March 8, 1957, the date the lease was executed, Mathews owned the surface and minerals of the two sections of land leased, save and except for a $\frac{1}{16}$ non-participating royalty interest. The non-participating royalty interest was owned as follows:

In *all* of Section 13, the non-participating royalty interest, consisting of a $\frac{1}{16}$ royalty, was owned by R. Niles Graham and Margaret Graham Cruseman. In *all* of Section 4, the non-participating royalty interest was owned by the Scott Trust, J. W. Sanders

and the Sanders Trust. Mathews acquired his executive powers under two separate and distinct titles and there is no provision in either chain of title which gave Mathews the authority or power to combine the titles in one lease. Kerr-McGee was under no legal obligation to accept a lease describing both titles. Kerr-McGee, when it secured the execution of the lease by Mathews on March 8, 1957, was charged with constructive notice of the recitations of all instruments in Mathews' two chains of title. Paragraph 12 of the oil and gas lease prepared by Kerr-McGee and executed by Mathews provides: "offsetting shall never be required to protect one portion of the leased premises against drainage through a well or wells on another portion of the leased premises." Paragraph 6 of the lease grants the right to the lessee to *consolidate* the lands covered hereby, or any portions thereof, with other lands, etc. Paragraph 7 provides that a well drilled "on any portion of the consolidated tract, regardless of where located thereon, shall be deemed to have been drilled under the terms of this lease on lands covered hereby * * *."

It is my contention that the interest owned by the Scott Trust on March 8, 1957, the date of the oil and gas lease, and since that time, is an interest in realty, and Kerr-McGee took the lease with full knowledge of the division of realty ownership. Furthermore, Kerr-McGee voluntarily acquired the lease charged with knowledge of the law of the "utmost fair dealing" the holder of the executive rights owes to non-participating royalty owners. There can be no question but that the authorities of this and other jurisdictions hold that an interest such as owned by the Scott Trust is an interest in land. See Brown v. Smith, 141 Tex. 425, 174 S.W.2d 43 (1943); State v. Quintana Petroleum Co., 134 Tex. 179, 133 S.W.2d 112, 134 S.W.2d 1016, 128 A.L.R. 843 (1940); Tennant v. Dunn, 130 Tex. 285, 110 S.W.2d 53 (1937); Sheffield v. Hogg, 124 Tex. 290, 77 S.W.2d 1021, 80 S.W.2d 741 (1934); Sheppard v. Stanolind Oil & Gas Co., 125 S.W.2d 643 (Tex.Civ.App.—

1939, writ ref'd); Hardwicke, "Problems Arising Out of Royalty Clauses in Oil and Gas Leases in Texas," 29 Texas L.Rev. 790, 791 (1951). If this were not so, why has this Court held in such cases as Minchen v. Fields, 162 Tex. 73, 345 S.W.2d 282 (1961) and Veal v. Thomason, 138 Tex. 341, 159 S.W.2d 472 (1942) that pooling effects a cross-conveyance among the owners of the minerals under the various tracts of royalty or minerals in a pool, and that pooling on the part of the holder of the executive rights cannot be binding upon the non-participating royalty owner in the absence of his consent. This record reveals that Kerr-McGee was well aware of this rule as shown by the following undisputed facts: On November 7, 1962, two days prior to the termination of the primary term, Sun Oil Company under a farm-out agreement with Kerr-McGee, commenced the drilling of a well for oil and gas on Section 13. The well was completed as a dual gas well capable of producing gas with condensate on February 6, 1963, but was not placed on actual production until June 28, 1963. On November 7, 1962, the same date the drilling operations were begun, Sun Oil Company sought to obtain an agreement between the owners of the non-participating royalty interest in Sections 13 and 4 in order to create a gas production unit. *All* of the non-participating royalty owners in Section 4 agreed to pool; however, *all* of the non-participating royalty owners in Section 13, refused. Thus, the attempted pooling agreement failed. Sun's letter to Sanders wherein it refers to such refusal says that "the fact that the well was located on their tract gave them a blind spot which we were unable to clear up for them." The record reflects that the Scott Trust, J. W. Sanders and the Sanders Trust were willing to pool their non-participating royalty interest as to gas with Graham et al. "so as to create a 704-acre unit. In creating the unit, the east 93 acres of Section 4 and Section 13 jointly, they being north and south of each other, would be eliminated from the pooling so that Section 13 and Section 4 would have pro rata acre-

age according to the acreage of each in the 704-acre unit. Brown [Sun's representative] agreed that any consideration, including overrides given the Grahams, would be given pro rata to Sanders, Scott and Saunders [meaning Sanders Trust] for the execution of the pooling agreement."

This is a proper case where the fiduciary standard of conduct on the part of the holder of the executive rights should be applied. See Jones, 15th Oil & Gas Inst. 35 (Sw. Legal Fdn. 1964). In Schlittler v. Smith, 128 Tex. 628, 101 S.W.2d 543 (1937), this Court said: "We think that self-interest on the part of the grantee may be trusted to protect the grantor as to the amount of royalty reserved. Of course, there should be the utmost fair dealing on the part of the grantee." Eminent authorities on oil and gas have written on this subject, such as Jones, as heretofore mentioned, Kuntz in 1 Kuntz, The Law of Oil and Gas 353, and A. W. Walker in Walker, "Developments in the Law of Oil and Gas in Texas During the War Years—A Résumé," 25 Texas L.Rev. 1 (1946). Walker, in this article, discussed the cases of Brown v. Smith, supra, and Schlittler v. Smith, supra, and made this significant comment:

"Indeed it would seem that a type of agency is involved, *and that a serious question might even be raised as to the scope 'of authority of such agent to execute a lease under which, by virtue of the wording of the habendum clause, the outstanding royalty interest might be burdened indefinitely as a result of production secured upon other lands in which the royalty owner would not be entitled to share.* In any event, it would seem that lessees would not desire to accept such a lease, but, on the contrary, would insist either that the non-participating royalty owner join in the execution of the lease with appropriate pooling provisions, or that a separate lease be executed on that part of the land covered by the non-participating royalty interest." 25 Texas L.Rev. at 18. (Emphasis added.)

The rule which should govern has been stated to be that an agent is a fiduciary with respect to the matters within the scope of his agency. The very relation implies that the principal has reposed some trust or confidence in the agent, and the agent or employee is bound to the exercise of the utmost good faith, loyalty, and honesty toward his principal or employer. The fiduciary relationship existing between an agent and his principal has been compared to that which arises upon the creation of a trust, and the rule requiring an agent to act within the utmost good faith and loyalty toward his principal or employer applies regardless of whether the agency is one coupled with an interest, or the compensation given the agent is small or nominal, or that it is a gratuitious agency. See Le Cuno Oil Co. v. Smith, 306 S.W.2d 190 (Tex.Civ.App.—1957, writ ref'd, n. r. e.); Williams, "The Fiduciary Principle in the Law of Oil & Gas," 13th Oil & Gas Inst. 201 (Sw. Legal Fdn. 1962). This Court should hold that where it has been conclusively shown that the holder of the executive rights has violated the duty he owed the non-participating royalty owner in executing the lease, and the lessee has knowingly participated in the violation thereof, the oil and gas lease should be terminated. Under this rule, I would terminate the lease insofar as Section 4 is concerned as to all parties. To hold otherwise would be highly prejudicial to the Scott Trust, J. W. Sanders and the Sanders Trust.

Kerr-McGee and Sun Oil Company say that since the oil and gas lease contains a warranty of "full fee simple title to all lands therein described, and plaintiffs, Virgil Mathews and wife, Elsie May Mathews, warranted and agreed to defend said title," all of the parties are estopped to deny that Mathews had the "power and authority to lease said lands on the terms and conditions set out in said lease." Since the lease was not executed by the holders of the non-participating royalty owners, the warranty clause (the Court uses—habendum clause) in the lease cannot be used as a ground of

estoppel against them. Estoppel is no defense against the non-participating royalty owners. Equally so, estoppel is no defense against Mathews since Kerr-McGee *knowingly* participated in violating the rights of the non-participating royalty owners.

It has been argued that the non-participating royalty owners have not attacked the lease by adverse action against Mathews. This was not necessary since apparently Mathews recognized that he violated his duty toward the non-participating royalty owners when, on September 10, 1964, he executed a quitclaim deed to the Scott Trust et al., conveying all of his "right, title and interest in the oil gas and other minerals in and under and that may be produced from Section 4, Block M–22, T. C. Ry. Co. Survey, Hutchinson County, Texas * * *."

Respondents seem to argue that the lease should not be terminated for an additional reason. The contention is made that on September 17, 1964, Sun Oil Company, the holder of the farm-out rights covering Sections 13 and 4, drilled a well to completion on a tract of land lying east of Sec. 4, and would have drilled on Section 4 but for this law suit. The fact that Sun drilled to completion a well on a section of land not described in the Mathews lease cannot be effective as a bar to petitioners' right to cancel the lease involved here. The drilling of the well on the section to the east of Section 4 was proved by an affidavit attached to respondents' motion for summary judgment. The affiant, A. N. Tyler, an employee of Sun Oil Company, stated:

"Following the completion on or about September 17, 1964, of the R. H. Furr Mathews well No. 2 located in Section 2, Block M–22, T. C. RR Company Survey, * * * which section adjoins said Section 4 on the East, our district geologist, Mr. Paul H. Horn, recommended on October 28, 1964, the drilling of the Virgil Mathews well No. 2. This location was approved for drilling at a point 1250 feet from the East line and 1600 feet from the North line of Section 4, Block

M–22, T. C. RR Company Survey, Hutchinson County, Texas. Before the location could be finally processed, we were advised on November 10, 1964, by our legal department that no additional operations should be undertaken on Section 4 without their prior approval because we had been served with a petition in a law suit filed by our lessors asserting that Sun Oil Company no longer had a valid lease on Section 4. We would have drilled the Virgil Mathews well No. 2 in said Section 4 had it not been for the lessors filing this suit and we would now drill such well were it not for this suit."

This procedure should not be used to determine the rights of the parties to this law suit. Their rights should be determined under the provisions of the oil and gas lease covering Sections 13 and 4. The allegation that Sun would have drilled on Section 4 had it not been for this law suit cannot be of any value when it is realized that the contract between Mathews and Kerr-McGee does not require Kerr-McGee or Sun to drill on Section 4. The contract expressly provides that offsetting shall never be required to protect one portion of the leased premises against drainage. The contract further provides, as above indicated, that a well drilled on any portion of a consolidated tract (well drilled on 13) shall be deemed to have been drilled (on 4) under the terms of this lease. This above mentioned affidavit leaves the inference that the non-participating royalty owners by bringing this suit to cancel the lease as to Section 4 had a selfish or sinister motive in filing the suit. In fact, the Court is convicting them of such motives without a trial.

The judgments of the courts below should be reversed and judgment here rendered unless it can be said that the case was tried on the wrong theory. I do not believe that any fact issue remains for the trier of the facts. The respondents did not plead laches, but conceivably such an issue could be raised.